**VIRGINIA:**

RECEIVED AND FILED
CIRCUIT COURT
JAN 05 2021
EDWARD F. JEWETT, CLERK
BY _____ D.C.

IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND
400 North Ninth Street
John Marshall Courts Building
Richmond, Virginia 23219

| | |
|---|---|
| **CYNTHIA GLISSON,** | |
| Plaintiff | |
| v. | Case No: CL21-41-1 |
| **GENEDGE ALLIANCE,** | |
| Serve: Bill Donohue<br>Genedge<br>32 Bridge Street S<br>Suite 200<br>Martinsville, Virginia 24112 | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

COMES NOW the Plaintiff, Cynthia Glisson (hereinafter "Plaintiff" or "Ms. Glisson"), by counsel and as her Complaint against the Defendant, Genedge Alliance (hereinafter "Defendant" or "Genedge"), sets forth the following allegations:

### INTRODUCTION

1. This Complaint presents civil claims alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983 ("§1983"), as amended, against Plaintiff's former employer, Defendant, Genedge.

2. Genedge failed to promptly investigate Ms. Glisson's complaints and take remedial action to end the discrimination. In addition, Genedge demonstrated a pattern and practice of granting

Page 1 of 19

preferential treatment toward male employees, including repeatedly failing to investigate complaints or reprimand male employees for misconduct.

3. Further, Genedge retaliated against Ms. Glisson in response to the gender discrimination complaint she filed in 2018. Following her complaint, Ms. Glisson was subjected to increased and intensified abusive, discriminatory behavior.

## PARTIES

4. Plaintiff is a citizen of the United States of America and a resident of Yorktown, Virginia.

5. Defendant, the A.L. Philpott Manufacturing Extension Partnership, doing business as Genedge Alliance, is a political subdivision of the Commonwealth of Virginia and a "person" subject to suit within the meaning of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983.

6. Ms. Glisson was employed by Genedge from February 25, 2015 until April 6, 2020.

## JURISDICTION AND VENUE

7. This action seeks declaratory judgment, injunctive relief, and compensatory and punitive damages for Defendant's violations of federal law.

8. This Court has jurisdiction pursuant to Va. Code § 17.1-513, because Plaintiff's claims are civil in nature and arise from events that occurred within the Commonwealth of Virginia.

9. This Court has jurisdiction over Defendant under Va. Code § 8.01-328.1, because Defendant is within the Commonwealth of Virginia.

10. Venue is proper under Va. Code § 8.01-257 et seq., because Richmond, Virginia is a forum convenient to the parties and the witnesses. The events giving rise to Plaintiff's claims occurred in or within close proximity of the City of Richmond.

11. Ms. Glisson satisfied the procedural and administrative requirements of Title VII, and all conditions precedent to the filing of this suit have been performed or have occurred:

    a. Ms. Glisson timely filed a Charge of Discrimination with the EEOC against Genedge on or about December 23, 2019, styled Charge No.: 438-2020-00417 ("the Charge").

    b. The Charge alleged sex discrimination and retaliation in violation of Title VII.

    c. On October 7, 2020, the EEOC issued a final determination on Ms. Glisson's complaint.

    d. The EEOC issued a Dismissal and Notice of Right to Sue to Ms. Glisson and this Complaint has been filed within ninety days of Ms. Glisson's receipt of the Notice.

## FACTS

12. Ms. Glisson is a 58-year-old Caucasian female who was hired by Genedge on February 25, 2015, as Vice President of Operations.

13. During Ms. Glisson's employment, she performed admirably in the face of discriminatory and retaliatory treatment from her male counterparts, in particular, President and Executive Director Bill Donohue.

14. Prior to Ms. Glisson's hire and immediately after reporting to work, Mr. Donohue's actions showed clear aversion to Ms. Glisson.

15. When the interview committee provided its recommendation for Ms. Glisson, Mr. Donohue told the committee that it had to provide him with two names. The committee did not do so; all other candidates were male. It is evident through this statement and his subsequent actions that Mr. Donohue would have preferred to hire a male candidate rather than Ms. Glisson.

16. Within a couple weeks of Ms. Glisson's hire, Mr. Donohue told at least one of Ms. Glisson's reports that he had made a horrible mistake by hiring Ms. Glisson. The report informed Ms. Glisson that she had just started and was not sure why Mr. Donohue would think this.

17. From the onset of Ms. Glisson's employment, Mr. Donohue began accusing Ms. Glisson of refusing to perform her job duties.

18. Despite Ms. Glisson's denials, Mr. Donohue continued to spread false allegations regarding her work, criticized Ms. Glisson's character, religion, and work, and belittled Ms. Glisson's experience and Southside origins throughout her tenure with the organization.

19. Nelson Teed, Manufacturing Technology Center ("MTC") Executive Director, was a direct witness to the comments made by Mr. Donohue about Ms. Glisson. For example, Mr. Donohue once stated, "You don't know what I have to deal with. She's a bible belt girl. She always wants to do the right thing."

20. In addition, Mr. Donohue belittled all people from Southside Virginia. Specifically, he stated, "These people can't even fix their phone or washing machine without calling someone from Roanoke," and commented regarding his administrative assistant, "She has been here ten years and still can't do Excel, she can't learn that."

21. On one occasion, Mr. Donohue knowingly had Ms. Glisson drive to James Madison University for a meeting that had already occurred (the meeting was at 2 p.m. not 4 p.m.). When the meeting was complete, he called to gloat and laugh at Ms. Glisson. Mr. Donohue told her, "Yes, I thought you would have figured that out."

22. From the beginning, Mr. Donohue did not support Ms. Glisson and set her up for failure. When Ms. Glisson would successfully complete the tasks that were designed for her to fail, Mr.

Donohue would state that the task was not completed. In one instance, Mr. Donohue stated, "I thought that was impossible."

23. Being set up for failure was a recurring theme during Ms. Glisson's tenure.

24. For example, Ms. Glisson has emails that show that Mr. Donohue complimented the results of a project only to later say it was incomplete at her performance review.

25. Mr. Donohue also attempted on three or four occasions to convince Ms. Glisson to voluntarily take a lesser role, which amounted to the same job responsibilities but with a lesser title and less pay. Ms. Glisson resisted this attempt and continued to perform admirably in her role.

26. Throughout Ms. Glisson's employment with Genedge, Mr. Donohue, and other male colleagues, treated Ms. Glisson with contempt — something that Mr. Donohue encouraged. Ms. Glisson persevered despite these challenges.

27. Because the instances of Genedge's disparate treatment directed towards Ms. Glisson are too numerous to list, this complaint will only address the retaliation and disparate treatment beginning in late 2018.

28. In 2018, after years of disparate treatment, Ms. Glisson filed a formal Title VII complaint regarding Mr. Donohue's treatment towards herself and other professional women at Genedge.

29. Genedge's Board of Trustees, via the Virginia Attorney General's Office, contracted a third party to investigate Mr. Donohue. After the investigation, the Attorney General's Office and the Board returned Mr. Donohue to his position as President and Director of Genedge and placed Mr. Donohue on a coaching plan related to his behavior.

30. Soon thereafter, Mr. Donohue began retaliating against Ms. Glisson and escalated this treatment personally and by involving others.

31. In an attempt to isolate her in retaliation for filing a complaint, Mr. Donohue transferred Ms. Glisson to the Hampton Roads office. Mr. Donohue's motivation for the transfer was to isolate her from the core team and exclude her from knowing what was going on within the organization.

32. In her absence, Mr. Donohue and Mr. Dean Young, Vice President of Industrial Development, ran the organization without her involvement.

33. In addition, the core team remained in Richmond, including Mr. Young. Two of the employees in Hampton Roads were new to Genedge, and the other, Mr. Tony Cerilli, was only in the office one or two days each month. Until new resources were hired in September 2020, no one used the Hampton Roads office in any significant way.

34. Further, after placing Ms. Glisson in Hampton Roads, Mr. Donohue excluded her from receiving credit for any Navy and shipyard work, which is a large source of Genedge work in Hampton Roads. Mr. Donohue had informed Ms. Glisson that she would not get credit for anything Mr. Donohue did even though Ms. Glisson or her team members performed the work. To Ms. Glisson's knowledge, Mr. Donohue never excluded male employees from receiving credit for Navy or Shipyard work. In fact, Mr. Donohue often directed Ms. Glisson to adjust the reviews of certain male employees to "Performs," or "Exceeds" even when they did not meet their goals.

35. On November 1, 2018, at a business meeting, Mr. Donohue commented to Mr. Teed that Ms. Glisson was incompetent and that Patrick Henry Community College's Human Resource Department mishandled Ms. Glisson's complaint against him.

36. Further, Mr. Donohue stated, "We'll see how Cindy does now that I've put her down in Hampton Roads."

37. Mr. Donohue also stated, "Cindy is a good trainer but she is not a consultant. I've got the Board of Trustees to see that she is not a consultant."

38. In August 2018, the Board of Trustees Chair, Tamea Franco, sent Ms. Glisson a condescending email, questioning, "Isn't your core position supporting and managing the Hampton Roads office?"

39. Although Ms. Glisson was the Operations VP with statewide responsibilities, Mr. Donohue gave Ms. Glisson regional responsibilities similar to his 2016 plan to make Ms. Glisson a Regional Manager. Based on Ms. Franco's email, Mr. Donohue downplayed Ms. Glisson's role in the organization to the Board Chair and likely to other key Board members.

40. On November 12, 2018, Ms. Glisson filed a complaint with Director of Human Resources Belinda Stockton regarding Mr. Donohue's November 1, 2018 comments.

41. On November 13, 2018, Ms. Stockton replied to Ms. Glisson in an email stating that after a discussion with Mr. Donohue and after reviewing her notes of Ms. Glisson's complaint, Mr. Donohue's comments did not rise to the level of harassment as defined by the Department of Human Resource Management's policy.

42. Ms. Glisson's complaints were consistently minimized and dismissed.

43. During Genedge's reorganization in 2018, Mr. Donohue developed the plan and new job descriptions. Ms. Glisson expressed her concerns about Mr. Young as a candidate for one of the positions, but she was ignored.

44. In addition, while Genedge went through the motions of interviewing Mr. Young for the position, he was the only person interviewed and the position was not advertised externally.

45. Finally, despite the fact that Mr. Young sought the Operations position and Ms. Glisson preferred the Regional position, Mr. Donohue refused to change the positions, telling Ms. Glisson that it would kill her due to her medical issues.

46. Although Ms. Glisson took very little PTO, Mr. Donohue often made comments to Ms. Glisson and to other people that she was always sick.

47. Moreover, on one occasion in December 2018/January 2019, Mr. Donohue asked Joshua Dawson, Chief Financial Officer and Business Manager, to investigate one of Ms. Glisson's expense reports because she was forced to stop at her mother's house and spend the night during a work trip due to a combination of bad weather, leaving a team meeting late, and having a bad headache. Mr. Donohue informed Ms. Glisson that she should have asked permission to stop, which was never expected from anyone else or from Ms. Glisson in the past.

48. In February 2019, Mr. Young told Ms. Glisson that he had been informed by Ms. Cindy DeOms that he would be replacing Ms. Glisson on the National Institute of Standards and Technology ("NIST") client survey process. When Mr. Young questioned Mr. Donohue about assuming this responsibility, Mr. Donohue quickly back peddled, much to Ms. DeOms's surprise. Mr. Donohue began this course of action to remove Ms. Glisson from the survey process, based, in part, on a false report from Ms. DeOms that Ms. Glisson failed to update client survey information.

49. When Ms. Glisson expressed that she felt she was being blamed for someone else's issue, Mr. Donohue dismissed her concerns.

50. During a meeting on March 1, 2019, Mr. Young became irate with Ms. Glisson after Ms. Glisson requested that Mr. Young stop interrupting the Project Manager's Power Point Presentation.

51. Mr. Young proceeded to turn red and hit a table multiple times before walking out of the presentation. Prior to leaving, Mr. Young raised his voice to Ms. Glisson then softly stated, "Everyone seems to want to do my job. I'm sorry that I'm wasting your time. Tell me what you

want me to do. I'll do whatever the hell you tell me to do. It seems that's the way you guys want it. I'm done."

52. Mr. Young had previously acted in a similar manner on four or five separate occasions. When Ms. Glisson addressed this incident with Mr. Donohue, Mr. Donohue stated that Ms. Glisson brings out that type of behavior in Mr. Young, and, to Ms. Glisson's knowledge, he failed to take action to stop the recurring outbursts.

53. Also in March 2019, Mr. Donohue and Mr. Young excluded Ms. Glisson from the process of creating the Action Officer and the Communications Coordinator positions, and dismissed her input when she did not agree with the approach or the resource selection. Immediately following the meeting in which her input was dismissed, Ms. Glisson vomited due to anxiety and stress.

54. On May 2, 2019, Mr. Donohue became irritated and walked out of a meeting with Ms. Glisson, Mr. Young, Mr. Jerry Robertson, Senior Advisor, and Mr. Steve Holcomb, Regional Growth Manager. Mr. Donohue later asked Ms. Glisson why he left the meeting. She responded that she thought he was annoyed with her protection of Mr. Holcomb and explained that Mr. Robertson had agreed to do what Mr. Donohue was blaming Mr. Holcomb for.

55. Mr. Holcomb previously brought concerns about Mr. Robertson to Mr. Donohue in March 2019. The concern was that Mr. Robertson, a contractor, went around Ms. Glisson and tried to schedule meetings with Mr. Holcomb and others without including or talking to Ms. Glisson. Rather than investigating those concerns, Mr. Donohue dismissed them. When Ms. Glisson raised these concerns, Mr. Donohue accused Mr. Holcomb of making false statements and stated that Mr. Holcomb could not be trusted due to his poor performance.

56. Because they were old colleagues and friends, Mr. Donohue hired Mr. Robertson despite the fact that Mr. Robertson had been out of the consulting environment for at least five years and

did not understand Genedge's current services. When Mr. Robertson was hired in the fall of 2018, Mr. Donohue instructed Mr. Robertson to directly report to Ms. Glisson. When Mr. Robertson did not report to Ms. Glisson or complete tasks, Ms. Glisson reported the situation to Mr. Donohue, who ignored it.

57. More concerning were the statements made by Mr. Robertson regarding Ms. Glisson's gender. During a conversation with Mr. Holcomb, Mr. Robertson stated, "…you know this working with manufacturing companies is a man's game and we don't need to include her [Ms. Glisson]."

58. When Ms. Glisson reported Mr. Robertson to Mr. Donohue on March 23, 2019 and again on May 2, 2019, Mr. Donohue shrugged and responded to Ms. Glisson, "What do you want me to do?" Mr. Donohue allowed Mr. Robertson's insubordination and discriminatory behavior to continue.

59. In June 2019, Mr. Young interrupted and spoke over Ms. Glisson during their joint presentation at the Behavior Based Leadership Model session in Lynchburg. In a meeting debrief the next day, Ms. Glisson shared unsolicited associate feedback with the management team. Ms. Glisson's feedback was ignored, and Mr. Donohue instructed Mr. Wolford to obtain the feedback instead. Mr. Young subsequently mocked Ms. Glisson's feedback in two July/August meetings.

60. On July 19, 2019, during a management meeting, Ms. Glisson excused herself to use the restroom. Ms. Glisson returned in less than three minutes, but when Ms. Glisson returned to the meeting, Mr. Donohue addressed Ms. Glisson in front of the group stating that he was offended that Ms. Glisson left the meeting and if Ms. Glisson did not want to be part of the conversation, she should "tell him right now and get out."

61. Yet, Mr. Young has walked out of meetings after angry displays and has not been publicly criticized for doing so. In an incident that occurred in October 2019, Mr. Donohue even made an excuse for Mr. Young and stated that Mr. Young left to go to the bathroom.

62. On August 5, 2019, during a meeting with Virginia Department of Human Resource Management Coach Deanna Goldstein, Mr. Donohue stated that he was "stabbed in the back last year (the time of Ms. Glisson's complaint), humiliated, and sent home for no reason," in an effort to diminish Ms. Glisson's concerns.

63. Mr. Young then stated that he "could not work with someone he could not trust and that he could be sent home for no reason," in an effort to intimidate Ms. Glisson and make her question the future of her employment.

64. Mr. Cerilli jumped in and stated that he could not work with someone he could not trust and that he could end up on tape and be sent home for eight weeks for "no reason" as well.

65. Ms. Glisson was present in the room during the entirety of their statements and was quite shaken at this joint display. This display was an attempt to coerce Ms. Glisson into "putting it in the past," when the past behaviors were continuing and escalating. Further, no discussion took place regarding a path forward that included any type of reconciliation.

66. On August 12, 2019, during a conference call, Mr. Donohue and Mr. Young falsely accused Ms. Glisson of intentionally not completing a contract and intentionally misleading Mr. Wolford, a regional manager. The call was belligerent and intimidating with a large amount of silence. At one point, Mr. Donohue asked Mr. Young if Ms. Glisson's apology sounded like an apology since Ms. Glisson used the "but" word, not the "and" word.

67. Ms. Glisson had apologized for any confusion, as it was not her intent.

68. After Ms. Glisson told Ms. Stockton that she felt threatened during the August 5 meeting, Ms. Stockton replied that the threat had to be physical and that the meeting was not a physical threat and did not meet the threshold for being a safety threat. Ms. Glisson explained that she doubted that workplace violence victims receive a verbal warning and that emotional threats can also have detrimental effects. Ms. Stockton again dismissed her concerns.

69. On August 26, 2019, Mr. Donohue wrote a counseling memo to Ms. Glisson because of an interview Ms. Glisson gave to the Martinsville Bulletin. In the interview, Ms. Glisson was very complimentary of Genedge and placed Genedge in a positive light. Subsequently, Mr. Donohue mandated that Ms. Glisson drive to Martinsville for a meeting with Ms. Stockton and himself. Neither party would inform Ms. Glisson about the reason for the meeting. During the meeting, Mr. Donohue informed Ms. Glisson that her interview violated Genedge policy.

70. However, when Ms. Glisson approached Mr. Donohue to inquire whether Genedge had a written policy, Mr. Donohue said that Genedge did not have a written policy, that it was Commonwealth policy, and insisted that Ms. Glisson should have known about the policy from Mr. Bollinger during her 2015 on-boarding. When asked about the Commonwealth policy, Mr. Donohue informed Ms. Glisson that it was an unwritten State rule that only agency heads can speak to the media. Mr. Donohue then requested that Ms. Glisson sign a statement affirming that she knowingly violated Genedge policy, which Ms. Glisson refused to do.

71. On September 9, 2019, Ms. Glisson received an email from Mr. Roy Luebke, a direct report to Ms. Glisson, stating that he would not speak with her because she was currently under investigation. Mr. Luebke further stated that he did not want to be part of the investigation, had provided his input to Mr. Donohue, and believed that it would be best if he reported to someone else.

72. Mr. Donohue disregarded Mr. Luebke's insubordination and accused Ms. Glisson of making statements that were untrue. Mr. Luebke has not spoken to Ms. Glisson since this date.

73. On September 12, 2019, Mr. Donohue reprimanded Ms. Glisson for usurping his authority by providing associates their final evaluation without his prior review. Mr. Donohue issued a second counseling memo accusing Ms. Glisson of adding and reviewing "manager's comments" with the team. However, Ms. Glisson conducted individual assessment/review evaluations in the same method as she had for the previous four years.

74. Thus, while Ms. Glisson's male counterparts were not reprimanded for significant misconduct such as insubordination and abusive and discriminatory behavior, Mr. Donohue searched for any conceivable reason to discipline Ms. Glisson and add negative reports to her personnel file.

75. Also on September 12, 2019, Mr. Donohue gave Ms. Glisson her annual review. When Ms. Glisson brought to Mr. Donohue's attention that prior reviews had been based on a point scale rather than a percentage scale, Mr. Donohue replied that Genedge has always used a percentage scale. Afterwards, Ms. Glisson confirmed the point scale usage with another colleague.

76. Further, Mr. Donohue criticized Ms. Glisson's performance on personal goal no. 5, which had a large stretch goal and was based on work that was not under her control. The large stretch goal, set by Mr. Donohue, was 200% of target instead of the 20% specified in the Performance Management Plan.

77. Specifically, without Ms. Glisson's knowledge, Mr. Donohue and Mr. Young made the decision to stop billing the client upon which her personal goal was based. However, her goal was not adjusted, and, as a result, she missed hitting the stretch goal.

78. For the September 2019 NIST national meeting, Ms. Glisson had planned to present about a high-value project that one of her team members led; however, Mr. Donohue had Mr. Young deliver the presentation, despite the fact that Ms. Glisson had contributed and worked more on the specific project. Ms. Glisson's work often went unrecognized.

79. Mr. Donohue continually treated Ms. Glisson's male counterparts differently.

80. When Mr. Young and Mr. Cerilli joined the management team, Mr. Donohue explained financial details and processes in one of the first team meetings. When Ms. Glisson asked Mr. Donohue why he was explaining this now, he said, "It is true that the previous CFO and I played things close and didn't think you needed to know this. Now, I think people do need to know."

81. Further, Mr. Donohue committed on numerous occasions to get Ms. Glisson a coach/mentor from NIST/MEP, but he never followed through on his commitment. When questioned, Mr. Donohue was adamant that it would not be him.

82. In September and October 2019, after the NIST MEP Conference, Ms. Glisson was engaged with creating a framework to tie client needs to each of Genedge's services. This was intended to be a guide for the Regional Growth Managers who report to Mr. Young. Part of Ms. Glisson's responsibilities included practice content, i.e. how work is performed.

83. When Ms. Glisson and Mr. Levy discussed this opportunity and presented a draft document in the October 2019 all-hands meeting, Mr. Young became angry about this and walked out of the meeting, mumbling as he passed Ms. Glisson, "I decide what they do. I decide."

84. As a result of the outburst, Strategy, Marketing, and Commercialization Practice Manager Mike Levy, who was presenting, sat down, and refused to continue with his presentation. Ms. Glisson convinced Mr. Levy to continue, while Mr. Donohue made an excuse for Mr. Young, stating "Don't worry, he just went to the bathroom."

85. In contrast, Ms. Glisson was once chastised for going to the bathroom during a management team meeting and was told to "get out if she didn't want to be there."

86. On October 8, 2019, Mr. Donohue informed Ms. Glisson that he was contacted by a State Agency regarding inappropriate and unprofessional behavior by Mr. Levy. They agreed that they jointly would meet with Mr. Levy, but Ms. Glisson never heard anything further from Mr. Donohue about setting up a meeting. Roughly a week later, Mr. Levy informed Ms. Glisson that Mr. Donohue had talked to him about this matter but did not relay the outcome. Ms. Glisson is not aware of whether Mr. Levy was ever disciplined regarding his unprofessional behavior.

87. In October 2019, Mr. Donohue attempted to blame Ms. Glisson for issues related to the closure of completed projects. However, the majority of the projects were the responsibility of Mr. Young, who was not held responsible for the failure of his team.

88. While Ms. Glisson was reprimanded in front of her coworker ("This apparent lack of discipline and management control is putting the business at substantial risk"), the male colleague was thanked for his contribution pulling it together at the last minute. This round of the survey process was consistent with previous quarters with one exception: more projects failed to be closed in a timely manner. In the end, the projects were closed prior to Genedge's data submission.

89. Throughout Ms. Glisson's employment, Mr. Donohue continually threatened Ms. Glisson and no one investigated the issues she raised in August and October of 2019 about Mr. Donohue's behaviors of retaliation.

90. Within the company, Mr. Donohue's abusive behavior towards Ms. Glisson was well known and several of her coworkers commented on that fact to her. In July 2019, one employee told Ms. Glisson to call him but not to email him. When Ms. Glisson asked why, the associate, who sat in the headquarters office, told Ms. Glisson "they are after you." Another employee told

Ms. Glisson that he was the only person left who supported her; and as time went on, he became belligerent to Ms. Glisson because he knew he could. The associate had a history of belligerent behavior toward another professional female at Genedge.

91.     Mr. Donohue's continual threats and the escalating belligerent treatment by Ms. Glisson's male colleagues eventually forced Ms. Glisson to be out on medical leave due to anxiety and stress caused by the harassment.

## COUNT I:

## SEXUAL HARASSMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

92.     Ms. Glisson hereby incorporates each of the above paragraphs as though fully set forth herein.

93.     At all times relevant to this Complaint, Ms. Glisson was an employee of Genedge.

94.     Ms. Glisson is a member of a protected class as defined by Title VII of the Civil Rights Act of 1964, as amended.

95.     Defendant, through its members, supervisors, employees, and agents, discriminated against Ms. Glisson because of her sex.

96.     Ms. Glisson's supervisor and coworkers continually treated her with contempt due to her sex and treated her male counterparts differently.

97.     Ms. Glisson's supervisor subjected her to abusive working conditions because he regularly chastised her, berated her, undermined her work, and frequently made demeaning comments based on her sex.

98.     Defendant, through its members, supervisors, employees, and agents, discriminated against Ms. Glisson on the basis of her sex by failing to promptly investigate her complaints and take remedial action to end the discrimination.

99. Defendant, through its members, supervisors, employees, and agents, acted with a reckless disregard for Ms. Glisson's civil rights as afforded by the Civil Rights Act of 1964, as amended.

100. As such, Genedge discriminated against Ms. Glisson in violation of Title VII of the Civil Rights Act of 1964, as amended.

101. As a direct and proximate result of this discrimination, Plaintiff has suffered and will continue to suffer pecuniary loss, mental anguish, pain and suffering, shame, humiliation, embarrassment, loss of enjoyment of life, and other non-pecuniary losses.

## COUNT II:

**RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

102. Ms. Glisson hereby incorporates each of the above paragraphs as though fully set forth herein.

103. Ms. Glisson engaged in protected activity when she filed a gender discrimination complaint in 2019 regarding Mr. Donohue's abusive behavior towards her.

104. Following her complaint, Defendant, through its members, supervisors, employees, and agents, subjected her to increased and intensified abusive, discriminatory behavior.

105. Further, Defendant relocated Ms. Glisson away from the core team, minimized her role within the organization, excluded her from decision making, and increased scrutiny of her actions and performance.

106. Ms. Glisson continued to oppose this discriminatory treatment and reported it to HR.

107. As a direct and proximate result of this discrimination, Plaintiff has suffered and will continue to suffer pecuniary loss, mental anguish, pain and suffering, shame, humiliation, embarrassment, loss of enjoyment of life, and other non-pecuniary losses.

## COUNT III:

## DEPRIVATION OF RIGHTS UNDER 42 U.S.C. § 1983

108. Ms. Glisson hereby incorporates each of the above paragraphs as though fully set forth herein.

109. Defendant, acting under color of state law, failed to properly investigate Ms. Glisson's complaints and protect her against abusive, discriminatory behavior based on her sex.

110. Defendant, acting under color of state law, adopted policies, regulations, and procedures with regard to the implementation and interpretation of their work-place policies, as made actionable by 42 U.S.C. § 1983.

111. Defendant, acting under color of state law, deprived Ms. Glisson of her Constitutional rights, or alternatively, acted in reckless disregard of and with a deliberate indifference to the Constitutional rights and protections afforded such persons and refused to allow equal protection under the law.

112. As a direct and proximate result of this discrimination, Plaintiff has suffered and will continue to suffer pecuniary loss, mental anguish, pain and suffering, shame, humiliation, embarrassment, loss of enjoyment of life, and other non-pecuniary losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant and in addition that this Court award Plaintiff:

A. A declaratory judgment finding that the acts and practices complained of herein constitute intentional and willful violations of the Plaintiff's rights under Title VII and §1983;

B. Compensatory damages, in an amount to be determined at trial, for past and future economic and non-economic losses, emotional distress, pain and suffering, humiliation, mental anguish, impairment of quality of life, and consequential losses;

C. Plaintiff's attorney's fees and costs of this action; and

D. Such other and further relief as may be proper and just.

## JURY DEMAND

A TRIAL BY JURY IS DEMANDED.

RESPECTFULLY SUBMITTED,
CYNTHIA GLISSON

By Counsel:

*/s/ Barbara Queen*

Barbara A. Queen (VSB #47314)
LawrenceQueen
701 E. Franklin Street, Suite 700
Richmond, VA 23219
Ph.: 804-643-9343
Fax: 804-643-9368
bqueen@lawrencequeen.com